No. 65,530

STATE OF KANSAS, *Appellant*, v. FELIZ GARCIA, a/k/a
FELIX GARCIA, a/k/a FELIP GARCIA, *Appellee*.
(827 P.2d 727)

Opinion filed
February 28, 1992.

*Rodney H. Symmonds*, county attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the brief for appellant.

*Don W. Lill*, of Emporia, argued the cause and was on the briefs for appellee.

The opinion of the court was delivered by

LOCKETT, J.: The district court suppressed evidence obtained from a search of defendant's vehicle and statements the defendant made after he was issued a warning ticket, released from custody, and then again detained by the officer. The State's interlocutory appeal claims a lack of substantial competent evidence in support of the trial court's rulings that (1) there was an illegal seizure of the defendant, (2) defendant's consent to a search of his vehicle was not voluntary, and (3) defendant's statements were not voluntary. In a 2-1 decision, the Court of Appeals reversed the

district court in an unpublished opinion filed August 9, 1991, holding there was insufficient evidence to support the district judge's finding that Garcia's consent to the search of the vehicle was not voluntary. Garcia's petition for review was accepted by this court.

On March 20, 1990, Kansas Highway Patrol Trooper John Marmon and other officers were conducting truck checks on Interstate 35. Trooper Marmon observed a vehicle change from the outside lane to the inside lane to safely pass the stopped truck and then return to the outside lane without signaling a lane change. Marmon left other officers to check the stopped truck, got into his automobile, followed the vehicle, and subsequently stopped it 9 miles from the check area between 11:02 and 11:05 a.m.

After stopping the vehicle, Marmon asked the driver for his license. The license indicated that the driver was Feliz Garcia, the defendant. Marmon requested the vehicle's registration and proof of insurance. Garcia reached into the glove compartment and started leafing through papers. Marmon asked Garcia who owned the vehicle. Garcia responded his brother did. Marmon ordered Garcia to gather the papers and accompany him back to the patrol car.

While in the patrol car, Garcia began searching through the documents again. During the conversation between Marmon and Garcia, Garcia stated he was en route to Kansas City to pick up his brother's girlfriend. Garcia indicated that his brother, Oscar Printz Garcia, had given him permission to use the car. Garcia testified at the suppression hearing that Marmon kept asking him if the driver's license he had handed the trooper was really his and commented that Garcia did not look Hispanic.

Garcia handed Marmon the vehicle registration receipt which indicated the vehicle was registered to Elsa M. Smith, Garcia's sister. Garcia testified that Marmon continually asked him if he had permission to drive the vehicle and whether the vehicle was stolen.

Marmon issued Garcia a warning ticket for failure to signal a lane change. After completing the warning ticket, Marmon handed Garcia the ticket. He told Garcia he was free to go. As Garcia reached to open the door and exit the patrol car, Marmon asked Garcia if he would consent to a search of the automobile.

Garcia responded that he was not carrying anything in the car, and again reached for the door. Marmon again stated that he wanted to know if Garcia was carrying anything. Garcia testified that Marmon asked several times for his consent to search the vehicle. During this exchange, Garcia asked Marmon why he wanted to search the car. Marmon explained that he wanted to search the vehicle for money, drugs, weapons, and contraband. Garcia testified Marmon never indicated that he could leave, and he felt that he was not free to leave.

After several attempts, the trooper obtained Garcia's verbal consent to search the vehicle. Marmon then requested that Garcia sign a written consent form. Marmon read the written consent form to Garcia, which stated:

"I understand that I have the right to refuse to consent to the search described below and to refuse to sign this form. I further state that no promises, threats, force or physical or mental coercion of any manner have been used to obtain my consent to the search described below or to sign this form. My signature on this form indicates that I have given my consent of my own free will and the named officer(s) may conduct a search. I also understand that I have the right to withdraw or revoke this consent at anytime."

The consent form was signed at 11:30 a.m.

After signing the consent form, Garcia told Marmon there was a handgun underneath the seat of the car. When asked for the key to the trunk, Garcia informed Marmon that he did not have a key to the trunk. Marmon asked Garcia if he could return the documents to the glove compartment. While putting the documents in the glove compartment, Marmon pressed the trunk release switch which he had earlier observed and the trunk opened.

After opening the trunk, Marmon went to the rear of the vehicle and noticed the odor of marijuana. Marmon subsequently found marijuana in a blue denim bag and a suitcase. Garcia was placed under arrest and read the *Miranda* warnings. Garcia told Marmon that he did not know anything about the marijuana. The search lasted approximately 45 minutes and was completed at 12:17 p.m. During the search, Garcia remained in the vehicle, although Marmon indicated he was free to exit the vehicle.

After being arrested, Garcia was handcuffed and taken to the Highway Patrol office at Emporia State University. Upon arrival, Marmon called the Drug Enforcement Administration and contacted Steve Freuh, a special agent with the Bureau of Alcohol, Tobacco, and Firearms. While waiting for Freuh to arrive, Garcia repeatedly told Marmon he did not know about the marijuana. Marmon did not respond to Garcia, but explained he was waiting for the DEA agent to arrive.

At some point in their conversation, Marmon told Garcia there might be a possibility the police would allow Garcia to continue to Kansas City in a set-up type of situation. Garcia later indicated to Marmon he wanted to contact an attorney or a family member. Marmon stated that if Garcia was going to contact an attorney, the interview was done. Marmon then explained to Garcia the set-up was not possible if he (Garcia) contacted his family because it might "tip them off that they might be involved with something." Garcia responded that was fine and agreed to talk to the DEA agent first. At one point, Marmon showed Garcia the phone and once again Garcia indicated that he wanted to wait for the DEA agent. Garcia stated he believed, as a result of his conversations with the trooper, that by talking to the drug agent he would be helping himself. Marmon indicated he made no promises regarding leniency, no one threatened Garcia, and he was not aware of any promises made to Garcia.

Sixty to 90 minutes after arresting Garcia, Marmon left Garcia, still handcuffed and in the room, to weigh the marijuana. While Marmon was out of the room, Agent Freuh arrived. When Marmon returned, he noted although Garcia had signed a second waiver of rights form for the DEA agent at 3:42 p.m., the interview had not yet begun. During the interview, Garcia told the agent he did not know anything about the marijuana. Garcia testified that Agent Freuh informed him of considerably harsher federal penalties and indicated "things would be a lot easier" if he cooperated with them. Garcia slightly changed his story and signed a statement about one hour after the DEA agent had arrived.

Garcia stated he signed the statement because he was hungry, had driven all night, and was tired of the police badgering him. Garcia also stated they threatened him with a urinalysis test and

a lie detector test and stated they would take fingerprints off the suitcase. The officers explained to Garcia that they wanted to record a conversation between him and his brother. Garcia stated although someone had brought him a cup of water or coffee, he was always handcuffed and had not been offered anything to eat during the interview. The district judge noted (1) the interview with the federal DEA agent lasted a considerable length of time; (2) Garcia was handcuffed during the interview; and (3) the DEA agent had used profanity when accusing Garcia of lying.

Garcia filed a motion to suppress on June 13, 1990. A hearing was held on June 28, 1990. At the suppression hearing Garcia claimed he signed the consent to search form without the opportunity to read it or to contemplate what the consent meant, and that he was not given the opportunity to examine the form outside Marmon's presence. Garcia acknowledged he understood the words in the consent form and that he was never threatened by Trooper Marmon. The consent form was signed approximately 30 minutes after the initial stop. Marmon testified that a typical stop to issue a warning ticket for a lane change or similar violation would be 10 to 15 minutes.

When questioned why he requested the search of the vehicle, Marmon indicated he became suspicious because:

1. Garcia had indicated his brother was the owner of the vehicle and that his brother allowed him to use the car; it was finally determined the car belonged not to Garcia's brother but to Elsa Smith. Marmon believed that Garcia did not know who owned the vehicle.

2. A suitcase was located on the front seat. Clothing hung on hangers, and a pair of boots and a bag containing personal toiletry items were in the back seat rather than in the trunk of the vehicle, where, Marmon believed, most people carry their clothing. Marmon stated that, for a man who was en route to pick up his brother's girlfriend, "it looked like he had enough clothes in there in my opinion and it seemed awfully strange that all these suitcases and this bag were in the interior." Judging by the amount of clothing, Marmon indicated Garcia could have been there for a week."

3. A quart of oil on the right front floorboard and tools under the driver's seat indicated to Marmon that Garcia did not want to have car problems—a typical concern of a drug smuggler.

4. A map was in the vehicle, which Marmon indicated was "typical of someone that would be smuggling narcotics."

Although he testified he relied on these factors, Marmon acknowledged that it was not illegal to carry clothing in the interior of a car or uncommon to find a map in a car, and he never asked how long Garcia was staying in Kansas City. Marmon also admitted it was not uncommon for someone to carry an extra quart of oil for their car.

In a memorandum decision, the district judge ordered the evidence obtained as a result of the search and all statements made subsequent to the delivery of the warning ticket suppressed, noting:

"1. The Fourth Amendment applies to all seizures of a person, including seizures that involve only a brief detention short of traditional arrest. Whenever a police officer accosts an individual and restrains his freedom to walk away, a seizure has occurred. *State v. Baker*, 239 Kan. 403, 720 P.2d 1112 (1986); *State v. Epperson*, 237 Kan. 707, 703 P.2d 761 (1985); and *State v. Damm*, 246 Kan. 220, 787 P.2d 1185 (1990). Brevity of the invasion of an individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion. *State v. Kirby*, 12 Kan. App. 2d 346, 744 P.2d 146 (1987). Both the scope and duration of a seizure must be strictly tied to and justified by the circumstances which rendered its initiation proper. *State v. Damm, supra,* p. 224.

"2. A search without a warrant is per se unreasonable subject only to a few specifically established and delineated exceptions. Upon the hearing of any motion to suppress, the State bears the burden of proving to the trial court the lawfulness of both the search and the seizure. *State v. Damm, supra,* p. 221-222.

"3. The existence and voluntariness of a consent to search must be proven by the State by a preponderance of the evidence and not by clear and convincing evidence. These matters are questions of fact that the trier of fact must decide in light of the totality of the circumstances. *State v. Ruden,* 245 Kan. 95, 774 P.2d 972 (1989).".

In his written opinion, the district judge stated that, after observing the trooper during the suppression hearing, he believed that the trooper stopped Garcia's vehicle to observe the defendant and obtain additional reasons to validate a drug interdiction stop. The judge stated that the trooper knew he had no opportunity

to stop the vehicle and observe its interior without relying on the traffic infraction as the basis for the stop. Although he doubted the stated reason for the stop, the judge determined the State had sustained its burden of proof by a preponderance of the evidence that the initial stop of Garcia's vehicle was valid.

The district judge noted that after delivering a warning citation to Garcia, the trooper "indicated a need, not a simple desire, for the Defendant to remain." The judge then held there was a second or continued seizure of Garcia which did not pass constitutional scrutiny because (1) the trooper did not have a reasonable and articulable suspicion of a crime being committed, and (2) the scope and duration of the seizure of Garcia exceeded that of the original valid stop. The judge found that the detention was unlawful and the evidence obtained as a direct result of the stop would be inadmissible as fruit of the poisonous tree, unless Garcia's subsequent consent to search was valid and removed the taint of the unlawful detention.

The district judge observed the State bore the burden of proving voluntariness of Garcia's consent to search the vehicle. The judge noted that Garcia was detained twice the time of a normal or routine stop. The district judge found Garcia orally consented to the search because he was subjected to repeated requests by the trooper for permission to search and Garcia believed he would not be allowed to leave until he allowed the trooper to search the vehicle. The judge observed that the trooper prepared a written consent form which he read to Garcia. The judge noted the trooper retained the form and never allowed Garcia the opportunity to independently review the form or contemplate the consequences of his actions in signing the form. The judge determined Garcia's written consent to search the vehicle was not voluntary and ruled the State had failed to meet its burden of proving voluntariness of the consent.

The district judge finally found that Garcia's oral statements, during the car stop and the subsequent interviews, were inadmissible because that evidence was tainted by the unlawful detention and illegal search of the vehicle and there was no sufficient intervening act that would purge the taint. The district judge stated that the trooper's testimony as to why he questioned Garcia after issuing the ticket was not credible. The proximity of the

arrest to the time of receipt of the statements where the car was stopped was so closely connected there was no independent act sufficient in and of itself to render Garcia's consent voluntary. The judge then noted the subsequent statements were obtained because Garcia was confronted with the illegally seized evidence and the method of interrogation, and Garcia was led to believe he would receive a benefit if he talked with the officers.

After reviewing the evidence, the Court of Appeals reversed. The majority reasoned that if the consent signed by Garcia was voluntary, the search of the vehicle was valid. It stated that voluntariness of the consent to search is to be decided in light of the totality of the circumstances, considering whether the defendant was threatened or coerced, and whether defendant was informed of his rights. The majority noted Garcia gave both verbal and written consent to a search of the vehicle. It observed that the trooper never threatened Garcia. Garcia admitted the trooper read the consent form to him, that he understood the words on the consent form and his rights as stated in the form, which included his right to refuse the search. Garcia testified the trooper was polite, never cursed or raised his voice, and the situation was cordial. The majority found there was insufficient evidence to support the trial court's determination that Garcia's consent was involuntary; it found the consent was valid and therefore the search of the vehicle was valid, and the evidence was properly seized.

The dissent reasoned the extended duration and the circumstances of the stop were improper. The extended duration rendered the stop an illegal seizure and the subsequent consent to search involuntary. The dissent stated that here the duration of the seizure was neither strictly tied to nor justified by a traffic stop for failure to signal a lane change. The consent form was signed 25 to 30 minutes after the initial stop and in an environment which the trial court found caused Garcia to believe that he would not be released until and unless he signed the consent. Further, as to the subsequent statements, Garcia was stopped at approximately 11:05 a.m. The consent to search was executed at 11:30 a.m. Garcia waived his Fifth Amendment rights at 3:42 p.m., approximately four hours and ten minutes after the consent to search was executed. The trial court found that during this

period, Garcia had no contact with any person other than law enforcement officers and was handcuffed and restrained throughout the four-hour period. Thus, the dissent concludes, Garcia's statement was not sufficiently "attenuated" to be admissible.

Only Trooper Marmon and Garcia testified at the suppression hearing regarding Garcia's consent to search. It is important to note that the district judge's decision to suppress the evidence was made after observing the witnesses and weighing their testimony. The district court found Marmon was not a credible witness, Garcia's consent was not voluntary, and Garcia had been coerced into giving consent to search the vehicle and his subsequent statements.

We believe the Court of Appeals majority reweighed the evidence in concluding there was insufficient evidence to support the trial court's finding that the consent was involuntary.

"Upon the hearing of a motion to suppress evidence, the State bears the burden of proving to the trial court the lawfulness of the search and seizure. [Citations omitted.] An appellate court will uphold a trial court's suppression of evidence if that ruling is supported by substantial competent evidence. *State v. Chiles,* 226 Kan. 140, 144, 595 P.2d 1130 (1979)." *State v. Damm,* 246 Kan. 220, 222, 787 P.2d 1185 (1990).

If the findings of the trial court on a motion to suppress evidence are based upon substantial evidence this court on review will not substitute its view of the evidence for that of the trial court. *State v. Chiles,* 226 Kan. 140, 144, 595 P.2d 1130 (1979).

"Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. [Citation omitted.] Stated in another way, 'substantial evidence' is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. [Citation omitted.]" *Williams Telecommunications Co. v. Gragg,* 242 Kan. 675, 676, 750 P.2d 398 (1988).

Here, as noted, the district court found the trooper was not a credible witness. The four reasons Marmon gave during his testimony for requesting a search of the vehicle support the district court's finding. Further, Garcia was detained twice the time of a normal or routine stop for a lane change violation. Garcia testified Marmon kept asking him if the driver's license he had

given Marmon was really his and Marmon commented Garcia did· not look Hispanic. Garcia testified that Marmon continually asked him if he had permission to drive the vehicle and whether the vehicle was stolen. Garcia testified after he received the warning ticket Marmon asked him several times if he would consent to a search of the vehicle and that he wanted to know if Garcia was "carrying anything." Garcia testified he felt he was not free to leave. Garcia testified Marmon obtained the written consent without allowing Garcia to review the consent form. Garcia had no contact with any other person from the time he was stopped until his statements to the officers and, further, he was handcuffed and restrained throughout this four-hour period. Garcia testified he was led to believe he would receive a benefit if he talked with the officers. This evidence supports the trial court finding that there was an illegal seizure of Garcia, that Garcia's oral and written consents to a search of the vehicle were not voluntary, and that the statements Garcia made were inadmissible.

The findings of the district court as to the motion to suppress the evidence seized and Garcia's statement to the officers are based on substantial evidence.

The judgment of the Court of Appeals is reversed, and the judgment of the district court is affirmed.